**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| WADE C. RIGGS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:18-CV-1943 PLC |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Wade Riggs seeks review of the decision of Defendant Social Security Commissioner Andrew Saul denying his application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.      Background**

In March 2016, Plaintiff, who was born December 1964, filed an application for SSI alleging that he was disabled as of April 1, 2002 as a result of "spinal fusion L4-L5-S1, bad knees and shoulders." (Tr. 63, 164-69)  The Social Security Administration (SSA) denied Plaintiff's claim, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 75-79, 83-85)  The SSA granted Plaintiff's request for review and conducted a hearing in December 2017. (Tr. 27-62)

In a decision dated February 14, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and concluded that Plaintiff "has not been under a disability, as defined in the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

Social Security Act, since March 31, 2016, the date the application was filed[.]"  (Tr. 10-22)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-4)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ[2]

At the time of the hearing, Plaintiff was fifty-two years old, had a GED, and lived with his mother in a second-floor apartment.  (Tr. 33, 38)  Plaintiff testified that he worked full time until 2001, when he "blew the L4, L5 at work."[3]

Plaintiff stated that he injured his right shoulder "working on a boat in an oil field" in the Gulf of Mexico.  (Tr. 39)  Plaintiff rated his right shoulder pain at a six without medication and a five with medication.  (Tr. 40)  His left shoulder started "giving [him] trouble" about eight months earlier, and it had become more painful than the right shoulder.  (Id.)  The pain in Plaintiff's left shoulder was a "strong nine" without medication and a "solid eight" with medication.  (Tr. 41)  Plaintiff admitted that he was "not diligent" about taking his pain medications, which included oxycodone, gabapentin, and baclofen.  (Tr. 40)  His pain medications reduced his pain for "three or four hours maybe."  (Id.)

Plaintiff suffered cervical and lumbar pain, which he attributed to "g[etting] jumped twice in [the] so-called knock out game….[f]irst time … six years ago.  And then three and a half years ago."  (Tr. 42, 44)  Plaintiff's treatment for neck pain included an ablation and injections, which he estimated reduced his neck pain from a ten to a five.  (Tr. 42-44)  Plaintiff's range of motion in

---

[2] Because Plaintiff does not challenge the ALJ's determination of his mental RFC, the Court limits its discussion to the evidence relating to Plaintiff's physical impairments.
[3] According to his healthcare providers' notes, Plaintiff was working at a convenience store when he injured his back.  (Tr. 252, 286)

his neck was limited, but he could turn his head "better to the left … than I can to the right." (Tr. 43)  Plaintiff rated his lumbar pain at six with medication and a "solid eight" without medication.  (Tr. 44)  In regard to his lumbar range of motion, Plaintiff explained that he could touch his knees "but I can't get anywhere near my ankles." (Id.)

Plaintiff stated that he also suffered knee pain and was "starting [his] third round of [O]rthovisc" injections, which "help[] a little bit" for "maybe two and a half months."  (Tr. 45)  Plaintiff added that his "hips are going out" and he had "problems with [his] ankles." (Id.)

Plaintiff testified that, on a typical day he would "cook, what little cleaning I can do…. Throw a load of laundry down the shoot, go down run some laundry, when I got enough energy, or I feel that I can.  Go out and walk when I feel like I can do that." (Tr. 48)  Plaintiff grocery shopped with his mother. (Id.)  Because he no longer had a driver's license, either his mother would drive him to the store and appointments or he would take the bus. (Id.)  Plaintiff regularly walked three blocks to the library to check out books and videos, but he qualified that, after the second block, "I'm starting to cramp up." (Tr. 49, 51)  Plaintiff did not have difficulty with personal care.  (Tr. 49)

Plaintiff estimated that he could sit for about forty minutes, but his back, hip, and shoulder pain would cause him to "fidget." (Tr. 50)  Plaintiff stated that he could stand in one place for twenty minutes and walk two blocks comfortably and three block uncomfortably.  (Tr. 51)  In regard to his upper extremities, Plaintiff affirmed that he could reach overhead with his right arm, but not his left arm, and he could reach in front with both arms. (Tr. 41-42)  He could not "reach back" with either arm. (Tr. 42)  Plaintiff also explained that his shoulder and radiating neck pain caused him to "drop [things] a lot more than I ever did before.  Forks, cups, whatever.  I do not have the strength or dexterity in either hand that I had before." (Tr. 55)

3

A vocational expert testified at the hearing. (Tr. 57-61) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and no work experience able to perform work at the light exertional level with the following limitations:

> That individual could occasionally reach overhead with the left upper extremity and push and pull occasionally with the left upper extremity. That person could occasionally climb ramps and stairs, and occasionally stoop. That person could never climb ladders, ropes or scaffolds. Further[,] from a mental standpoint, that individual could engage in simple repetitive tasks in a work environment that is free of fast-paced quota requirements that involved only simple work-related decisions and few, if any, workplace changes. And further, that that individual could work in proximity to, but not in coordination with others and have no more than occasional contact with supervisors and the general public.

(Tr. 58) The vocational expert responded that such an individual could perform the light, unskilled positions of cleaner and hand packer. (Tr. 59) When the ALJ asked the vocational expert to consider the same hypothetical individual but with a limitation to sedentary work, the vocational expert testified that such an individual could work as a hand packer or "production worker, assembler." (Id.) However, if the hypothetical individual was able to perform light work but was limited to either being off task more than fifteen percent of the day or "bilaterally occasional reaching in all directions, no overhead reaching for either upper extremity," that person could not sustain full-time employment.

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his statement of uncontroverted material facts, as admitted by the Commissioner. [ECF Nos. 17, 22-1] The Court also adopts the facts contained in the Commissioner's statement of additional facts because Plaintiff did not dispute them. [ECF No. 22-1]

### III.     Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 1382(a)(1).

4

The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process. See 20 C.F.R. § 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. 20 C.F.R. § 416.920(a)(4)(iii).

At step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). See also 20 C.F.R. § 416.945(a)(1). The ALJ also determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform

past relevant work, he or she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R § 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled. 20 C.F.R. § 416.920(g).

### IV. ALJ's Decision

Applying the five-step evaluation, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since March 31, 2016; and (2) had the severe impairments of degenerative disc disease of the cervical spine and lumbar spine, degenerative joint disease of the right shoulder, tendinitis of the left shoulder, and affective disorder. (Tr. 12-13) Additionally, the ALJ determined that Plaintiff had the following non-severe impairments: history of left knee arthroscopic surgery, basal cell carcinoma of the back, and substance addiction disorder. (Tr. 13) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Id)

The ALJ reviewed Plaintiff's testimony and medical records and found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 16-17) For example, the ALJ stated that the medical imaging in Plaintiff's file revealed

6

"generally mild findings [that] are inconsistent with the severity of the claimant's allegations." (Tr. 17) The ALJ further noted that Plaintiff's "clinical signs" – including "mildly restricted range of motion in both shoulders and slightly reduced strength at 4/5," normal gait, full strength in lower extremities, normal reflexes, and intact sensation – were inconsistent with his subjective allegations. (Tr. 17) Finally, the ALJ found that Plaintiff's conservative medical treatment and activities such as painting, mowing, and golfing, undermined his subjective allegations. (Tr. 18)

The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations:

> [H]e can occasionally push, pull, and reach overhead with his left upper extremity. He can occasionally stoop and climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. He can perform simple, routine tasks in a work environment free of fast-paced quota requirements involving only simple, work-related decisions, and few, if any, workplace changes. He can work in proximity to but not in coordination with co-workers and have no more than occasional contact with supervisors and the general public.

(Tr. 15) Based on the vocational expert's testimony, the ALJ found that Plaintiff did not have any past relevant work but he could perform jobs that existed in significant numbers in the national economy, such as cleaner and hand packer. (Tr. 21-22) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 22)

### V.   Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ: (1) did not include in the RFC sufficient limitations on the use of his arms to account for his shoulder impairments; and (2) failed to properly consider the opinion of Plaintiff's treating physician. [ECF No. 16] In response, the Commissioner asserts that: (1) the ALJ's RFC finding sufficiently accounted for Plaintiff's shoulder impairments and resulting limitations; and (2) the ALJ properly weighed the medical opinion evidence. [ECF No. 22]

7

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. RFC

Plaintiff argues that the ALJ erred in determining his physical RFC because she limited only the use of his left arm, but not his right arm, to occasional pushing, pulling, and reaching. Plaintiff asserts that "this is particularly important in this case" because if the restriction applied to both arms, Plaintiff would be limited to sedentary work. Plaintiff explains that, if he were limited to sedentary work, he would "satisfy the requirements to qualify for SSI set forth in GRID Rule 201.12 based on the ALJ's finding that Plaintiff is closely approaching advanced age, he has

8

a high school education and no past relevant work."[4]  [ECF No. 16 at 3-4]  The Commissioner counters that the diagnostic imaging and Plaintiff's hearing testimony supported the ALJ's decision not to include in the RFC limitations for Plaintiff's right arm.  [ECF No. 22]

RFC is defined as what a claimant can do in a work setting despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §416.945(a)(1).  The ALJ must determine a claimant RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); 20 C.F.R. § 416.945(a)(3).  A court will uphold an ALJ's RFC determination if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff's first recorded complaints of shoulder pain appeared in November 2016 when he informed his primary care physician Dr. Henrichs that his "shoulders and hips have flared up. Opiates have not been helping."  (Tr. 510, 520)  On examination, Dr. Henrich noted:  "Mildly restricted [range of motion] on lateral abduction of shoulders bilaterally, R worse than L…. Mild pain on palpation of anterior-lateral shoulders R > L.  Some popping of right shoulder with abduction…. No gross motor deficits…. [Strength] 4/5 of shoulder abductors.  Reflexes 2+. Sensation intact in all extremities."  (Tr. 512)  Dr. Henrich prescribed Naproxen and ordered a right shoulder x-ray.[5]  (Tr. 513)

---

[4] The Medical-Vocational Guidelines, or "Grid Rules," are "a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability."  Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012).  Grid Rule 201.12 provides that persons limited to sedentary work, who are closely approaching advanced age, ages 50–54, and who are high school graduates and have unskilled work experience, are presumptively disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.12.

[5] The report of this shoulder x-ray does not appear in the record.

9

When Plaintiff followed up with Dr. Henrich in December 2016, he reported "mild improvement with Naproxen," but Dr. Henrich's clinical observations relating to Plaintiff's shoulder were unchanged. (Tr. 503-04) When Dr. Henrichs examined Plaintiff in January 2017, he did not note pain on palpation, but he observed "[m]ildly restricted [range of motion] on lateral abduction of shoulders bilaterally, R worse than L" and strength "4/5 of shoulder abductors." (Tr. 497-98)

In February 2017, an MRI of Plaintiff's right shoulder revealed: "[a] small subchondral cyst/erosion measuring 0.3 cm seen at the superolateral humeral head along attachment site of supraspinatus tendon" and "[a]cromioclavicular joint hypertrophy." (Tr. 654-55) When Plaintiff presented to Dr. Henrich in February and March 2017, Dr. Henrichs noted "[m]ildly restricted [range of motion] on lateral abduction of shoulders bilaterally, R worse than L" and 4/5 strength of shoulder abductors. (Tr. 482-84, 486-88))

At Plaintiff's appointment with pain specialist Dr. Padda in March 2017, Dr. Padda noted a labral tear and "[s]evere shoulder pain with reduced [range of motion], limitation in adduction and abduction…. Localization to a/c joint and shoulder girdle complex." (Tr. 403) Dr. Padda administered a right shoulder joint injection. (Tr. 403) Later that month, Plaintiff informed Dr. Henrich that he had recently enjoyed a golfing trip with some friends and his pain was stable. (Tr. 474-76) Physical examination of Plaintiff's right shoulder was unchanged. (Tr. 476)

In May 2017, Plaintiff presented to orthopedic surgeon Dr. Keener. (Tr. 801) Physical examination of Plaintiff's right shoulder revealed: "AC joint is nontender. There is no visible cuff atrophy. He can actively elevate to 150, external rotation 60 degrees. True glenohumeral abduction 90 degrees. Impinge sign slightly positive. He can reach behind his back to the thoracolumbar junction. Patient has mild abduction weakness with pain. External rotation strong

10

and painless." (Id.)  Dr. Keener ordered an x-ray of Plaintiff's right shoulder, which showed "a healthy glenohumeral joint, mild AC joint arthritis" and he noted that an "[o]utside MRI … shows a healthy shoulder." (Tr. 801)  Dr. Keener diagnosed "chronic shoulder pain from cuff tendonitis and relative disuse" and concluded "[t]here is nothing structurally wrong with his shoulder." (Id.)  Dr. Keener recommended a subacromial injection and "structured therapy." (Id.)

Dr. Henrichs again noted Plaintiff's "mildly restricted [range of motion] on lateral abduction of shoulders bilaterally" on examination in June and September 2017. (Tr. 432, 452)  At his September 2017 appointment with Dr. Henrichs, Plaintiff reported that he "[h]urt both of his shoulders" and had mowed the lawn. (Tr. 429)  In November 2017, Dr. Padda treated Plaintiff's bilateral shoulder pain with joint injections. (Tr. 623)

Dr. Henrichs completed a medical source statement (MSS) for Plaintiff in December 2017. (Tr. 778-79)  Dr. Henrichs stated that Plaintiff had a "labrum tear on L shoulder + partial on right" and clinical findings included decreased range of motion and pain on palpation of his shoulders. (Tr. 778)  Dr. Henrichs limited Plaintiff to lifting and carrying zero to ten pounds and stated he could not frequently reach, overhead reach, push, pull or perform gross manipulation with either arm, but he could frequently handle, finger, and feel. (Tr. 779)

The ALJ thoroughly reviewed Plaintiff's medical records and noted that physical examinations in December 2016 and January, March, May, August, and September 2017 revealed "mildly restricted range of motion on lateral abduction of bilateral[] shoulders" and shoulder strength 4/5. (Tr. 17)  The ALJ noted that Plaintiff's MRIs showed "only a small subchondral cyst/erosion and AC joint hypertrophy" in the right shoulder and "thinning and fraying of the distal supraspinatus tendon, a small chondral cyst/erosion, and AC joint hypertrophy" of the left shoulder. (Tr. 17)  The ALJ also discussed Dr. Keener's May 2017 evaluation of Plaintiff's right

11

shoulder in which he observed "somewhat reduced range of motion" and "only mild abduction weakness with pain, strong and painless external rotation, [and] negative biceps provocation tests[.]" (19-20)  Based on her review, the ALJ limited Plaintiff to occasional pushing, pulling, and overhead reaching with his left arm but did not similarly limit the use of his right arm.  (Tr. 15)

Plaintiff argues that the ALJ erred in failing to include in the RFC limitations on Plaintiff's right arm.  However, a claimant bears the burden of proving his limitations.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  Here, Plaintiff did not prove that his right shoulder impairment was either as severe or as limiting as his left shoulder impairment.  To the contrary, Plaintiff's routine examinations consistently showed only mildly restricted range of motion in his shoulders, and the diagnostic imaging of record showed that Plaintiff's right shoulder impairment was less severe than his left shoulder impairment.  Dr. Henrichs' MSS reflects this difference in severity, where he identified Plaintiff's impairments as:  "labrum tear on L shoulder + partial on right."

Most importantly, Plaintiff testified at the hearing that his right shoulder pain was less severe than his left shoulder pain.  (Tr. 41)  Plaintiff also stated that he was able to raise his right arm overhead, but not his left arm, and he could reach both arms in front of him.  (Tr. 41-42)  His left arm was also more restricted thanß his right arm in terms of "reach[ing] back."  (Tr. 42)  The ALJ appropriately relied on Plaintiff's own testimony, as well as the medical records, in determining Plaintiff's RFC.  See, e.g., Spengemann v. Saul, No. 4:19-CV-2423 JAR, 2020 WL 5801048, at *6 (E.D. Mo. Sept. 29, 2020).  See also Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) ("The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations.").

12

Finally, Plaintiff's attorney's opening statement supported the ALJ's finding that Plaintiff was limited to occasional pushing, pulling, and reaching with his left arm only.  When listing Plaintiff's physical impairments, his attorney stated:  "There's also degenerative arthritis in … both shoulders with the left side being more severe including what looks like a partial rotator cuff tear."  (Tr. 34)  In regard to Plaintiff's functional abilities, his attorney advised the ALJ that Plaintiff was "*restricted at least on the left upper extremity* with respect to overhead reaching and only occasional pushing, pulling with the left upper extremity."  (Tr. 37) (emphasis added)  An ALJ may consider statements made by a claimant's counsel, along with the other evidence of record, when assessing a claimant's functional abilities.  See, e.g., Howell v. Colvin, No. 1:15-CV-20 NCC, 2016 WL 492710, at *9 (E.D. Mo. Feb. 9, 2016).

Based on the Court's review of the record, the Court finds that substantial evidence supported the ALJ's determination that Plaintiff was not limited to occasional pushing, pulling, and reaching with his right arm.  Although Plaintiff cites evidence that might support a contrary decision, substantial evidence supported the ALJ's RFC determination and, as such, this Court is required to affirm.  See, e.g., Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007).

C. Treating physician's opinion

Plaintiff claims that the ALJ failed to properly evaluate the opinion of Plaintiff's primary care physician, Dr. Henrichs.  More specifically, Plaintiff asserts that the opinion expressed in Dr. Henrichs' MSS was entitled to substantial, if not controlling, weight because it was supported by the objective medical evidence and the treatment provided.  The Commissioner counters that the ALJ properly considered Dr. Henrichs' MSS and assigned it little weight because it was based substantially on Plaintiff's self-reported limitations and it was inconsistent with the diagnostic imaging, treatment notes, and consulting physician's report.

13

A treating physician's opinion regarding a claimant's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[6] Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. § 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007)).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give

---

[6] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. § 416.920c. Plaintiff filed his application in 2016, so the previous regulations apply.

14

good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Henrichs treated Plaintiff regularly from April 2016 through September 2017. Beginning in November 2016, Dr. Henrichs consistently noted on physical examination that Plaintiff exhibited only "mildly restricted" range of motion and 4/5 strength of the shoulders bilaterally. (Tr. 510-13)  Dr. Henrichs also consistently documented Plaintiff's normal gait and stance, no gross motor deficits, full range of motion of knees, strength 5/5 of lower extremities, normal reflexes, and intact sensation in all extremities. (Tr. 432, 442, 452, 463, 504, 512)

In his MSS of December 2017, completed on a checklist form, Dr. Henrichs opined that Plaintiff was able to lift/carry ten pounds and stand and walk no more than two hours in an eight-hour workday. (Tr. 779)  Dr. Henrichs also stated that "sustained sitting is not possible" for Plaintiff, and Plaintiff was unable to "frequently":  reach overhead; reach, push, pull; or perform gross manipulation with either arm. (Id.)  According to Dr. Henrichs' MSS, Plaintiff's pain would "frequently" interfere with his ability to maintain attention and concentration and Plaintiff would require "more than 2 hours" of rest per workday. (Id.)  Dr. Henrichs concluded that Plaintiff was "unable to perform [the functions required for light work] for more than 1 – 2 hours max without significant breaks." (Tr. 778)

The ALJ considered Dr. Henrichs' MSS and determined that the limitations he imposed were "based substantially on the claimant's own self-reported limitations, without support in the record." (Tr. 20)  The ALJ further found that Dr. Henrichs' opinion was "inconsistent with the generally mild imaging and generally normal examinations found throughout the record," and the MSS was "vague, in that 'sustained basis' is not defined." (Id.)  The ALJ therefore assigned Dr. Henrichs' opinion "little weight." (Id.)

15

While Dr. Henrichs' treatment notes support some functional limitations, they do not support Dr. Henrichs' opinion, which, if accepted, would preclude Plaintiff from performing any work.  Although Dr. Henrichs opined that Plaintiff could stand or walk no more than two hours in an eight-hour work day, his clinical observations consistently recorded normal gait and stance, full strength of the lower extremities, no gross motor deficits, normal reflexes, and full or mildly restricted range of motion of the knees and hips.[7]  Nothing in Dr. Henrichs' treatment notes suggested that Plaintiff was unable to either stand or walk for more than two hours per workday or sit for a "sustained" period of time.  "An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes."  Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quoting Davidson v. Astrue, 578 F3d 838, 843 (8th Cir. 2009)).  Further, to the extent Dr. Henrich based his opinion on Plaintiff's self-reported limitations, "[a]n ALJ may award less weight to a medical opinion when that opinion appears to be largely based on the plaintiff's subjective complaints."  Sears v. Berryhill, No. 6:16-CV-3483-CV-RK, 2017 WL 6343804, at *1 (W.D. Mo. Dec. 12, 2017) (citing Gonzales, 465 F.3d at 895).

Dr. Henrichs' treatment records also contained notations relating to Plaintiff's daily activities that suggested Plaintiff was less limited than Dr. Henrichs stated in the MSS.  For example, in March 2017, Dr. Henrichs noted that Plaintiff recently enjoyed a golf trip with friends and, in June 2017, he had been riding his bicycle. (Tr. 449, 474)  In August 2017, only month before Dr. Heinrichs completed the MSS, Plaintiff called Dr. Henrichs' office to report that he

---

[7] Likewise, Plaintiff's pain specialist, Dr. Padda, consistently observed that Plaintiff displayed normal gait and station.  (Tr.  714, 738, 742, 746)  In February 2016, the consulting examiner observed Plaintiff:  walked normally; could heel walk, toe walk, tandem gait in a normal fashion; could squat to 100 degree bilateral knee flexion; and was able to rise from a chair and get on and off the examining table independently.  (Tr. 286-88)

16

"walked 8 -9 miles yesterday and his cramping has become progressively worse today." (Tr. 438) The fact that Plaintiff could golf, bike, and walk long distances, even with pain, undermined Dr. Henrichs' opinion that Plaintiff could not stand or walk more than two hours in an eight-hour workday.  Activities of daily living that are inconsistent with a treating physician's opinion can "support[ ] the ALJ's decision not to accord [the physician's] opinion controlling weight." Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016); see also Thomas v. Berryhill, 881 F.3d 672, 676 (8th Cir. 2018) ("[Plaintiff's] self-reported activities of daily living provided additional reasons for the ALJ to discredit [the treating physician's] pessimistic views of her abilities."); Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (finding that inconsistent daily activities supported discounting the limitations outlined by a treating physician).

The ALJ further found that Dr. Henrichs' opinion was inconsistent with other medical evidence of record, including "generally mild" diagnostic imaging.  Knee x-rays taken in August 2016 showed "normal bilateral knees." (Tr. 633)  MRIs of Plaintiff's knees in September 2016 revealed:  sprain of anterior cruciate ligament, small joint effusion, and no other obvious abnormality on the right; and sprain of anterior cruciate ligament, cyst measuring .5 cm in the proximal tibia, small joint effusion and no other obvious abnormality on the left.  (Tr. 659-62) MRIs of Plaintiff's shoulders in 2017 revealed "thinning and fraying of the distal supraspinatus tendon" on the left and "some chondral cyst/erosion measuring 0.3 cm at the superolateral humeral head and acromioclavicular joint hypertrophy" bilaterally.  (Tr. 645-46, 654-55)  In May 2017, a shoulder specialist reviewed x-rays of Plaintiff's right shoulder, which showed mild acromioclavicular joint osteoarthritis, and concluded there was "nothing structurally wrong with the shoulder." (Tr. 331-32, 801)  The ALJ considered and discussed the medical imaging of record and determined that it did not justify the degree of limitations contained in Dr. Henrichs' opinion.

17

See, e.g., Murphy v. Berryhill, No. 2:15-CV-69 NCC, 2017 WL 1132345, at *4 (E.D. Mo. Mar. 27, 2017).

Finally, the Court notes that Dr. Henrichs' opinion was primarily provided in the checklist format.  A provider's checkmarks on a form are conclusory opinions which can be discounted if, as is the case here, they are contradicted by other objective medical evidence.  Stormo, 377 F.3d at 805–06; Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  See also Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (checkmarks on a MSS are conclusory opinions which can be discounted if contradicted by other objective medical evidence).  "[A] conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration." Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014) (quoting Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012)).  Upon review of the record, the Court finds that the ALJ properly evaluated Dr. Henrichs' medical opinion and provided "good reasons" for assigning it little weight.

### IV.  Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.  Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of November, 2020